[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff is forty-seven and the defendant is fifty-five. It is a second marriage for both. The parties have one child, Matthew, born November 26, 1988. Plaintiff is a graduate of Bucknell University, has a master's degree in industrial relations from Cornell University, and for the past twenty-five years, she has been employed by Union Carbide. In recent years, she has been involved in organizational development at Union Carbide. Since June of 1994, she has been employed on a part-time basis. She presently works sixteen hours per week and earns $66,000 per year before taxes. She no longer has medical coverage through her employer, but has been covered pursuant to the health insurance policy of the defendant. She enjoys good health and sees a therapist on a regular basis. The plaintiff and the defendant met in 1981 during the course of their employment at Union Carbide. At the time of the marriage, defendant was Vice-president in charge of bulk gas at Union Carbide. Subsequent to that time, he became president and chief operating officer of Praxair, a division of Union Carbide. He worked as president for a period of eight years and earned $530,000 base salary and a bonus of $325,000 or a total of $855,000 in 1998, just before his retirement on January 4, 1999. A personal and sexual relationship developed between the parties in June of 1985, approximately two years before their marriage. At that time, the defendant was still married, and he was the father of two children by his then wife. Plaintiff was aware of his marital status. The parties married on October 3, 1987.
In February of 1996, as a result of overhearing the defendant's phone conversation, and after finding pictures in defendant's briefcase, she suspected the defendant was having an affair. After hiring a private investigator, plaintiff determined that defendant clearly had a serious interest in another female. She also found photographs of a woman and a new born child as well as an affidavit of support for the same child in defendant's briefcase. In May of 1995, according to the plaintiff, defendant admitted to a brief sexual escapade with someone other than his current paramour, Jia Gang. He categorically denies this conversation. In May of 1996, the defendant told the plaintiff he wanted a divorce, and shortly thereafter plaintiff commenced this action. She had previously seen her attorney about a dissolution in June of 1995, after defendant told her he felt like he was trapped. At defendant's April 1, 1997 deposition, plaintiff found out that defendant's paramour was Jia Gang. Defendant claims that plaintiff had, since the inception of the marriage, overanalyzed him. Plaintiff claims she brought to the marriage financial CT Page 6795 assets totaling approximately $70,000, which included her equity in a condominium as well as jewelry and furnishings. She had IRA's valued at $13,000, a PIA valued at $5700, and a 401K that had a value of $21,000 at the time of her marriage to the defendant. During the duration of the marriage, she worked sixty hours per week while taking care of their son, and participated in numerous events with the defendant that were business related. The defendant claims that she was not an asset to his occupation and that she complicated his upward movement in Praxair by being difficult with his fellow executives. It is the plaintiff's contention that she went to a large number of events with the defendant that were business related, and she claims that her participation was in fact very helpful to the defendant. The dissolution action was commenced by plaintiff in May of 1996. The defendant left the family home in August of 1997. The defendant testified that the parties stopped having marital relations in November of 1994, but the plaintiff insisted that marital relations continued to March of 1995.
The defendant is now fifty-five and in generally good health except for some eye problems. The defendant is well educated with a degree in mechanical engineering from Northwestern, and took further studies subsequent thereto. He started at Union Carbide in December of 1962 in a work-study program while still in college. He was actively recruited by Union Carbide, and except for a three year stint in the U.S. Navy, he has always been employed by Union Carbide or its subsidiary Praxair. His extremely high potential was discovered early according to John Maclean, a highly regarded and long time inveterate executive at Union Carbide whose deposition was introduced at trial. The defendant steadily advanced through the corporate organization, and by 1987, he was a vice-president and the highest rated employee in the organization. He became president of Praxair in 1990. Defendant claims that in the spring of 1985, plaintiff suggested that she could be of assistance to the defendant with respect to his personal problems. Plaintiff explained that she had previous psychological counseling experiences in addition to her background in that field. The defendant claimed that he felt trapped into the marriage and that he felt guilty about his first divorce. Defendant testified that shortly after Matthew's birth, it was clear that the marriage had broken down. He further testified that the plaintiff indicated she would never leave Ridgefield, and that she had everything she wanted, including an elaborate home, status in the community, a child, a career, country clubs, and the other highly sought after amenities of CT Page 6796 life. In June of 1995, the defendant began a relationship with Jia Gang, and they had a son, Edgar Jia Hotard, born on February 13, 1996. In December of 1998, he was forced to involuntarily retire from Praxair after the Board of Directors advised him that he would be terminated. The forced resignation was based on his relationship with Ms. Gang and started with an anonymous letter to the Board of Directors at Praxair detailing his affair and the introduction of Ms. Gang and baby to the Danbury community. Defendant negotiated a severance package and obtained a substantial financial award. The severance agreement, consulting agreement, and value of accrued vacation time total $3,309,308. He was, however, required to agree to a noncompetition clause for a three year period from the date of his termination. The defendant takes the position that he did not share even 1 percent of the responsibility of the breakdown of the marriage, and that the plaintiff had no redeeming characteristics. The defendant, however, sent numerous cards to the plaintiff that were clearly laudatory. The first time that the plaintiff became aware of defendant's liaison with Ms. Gang was on April 1, 1997, at his deposition, when he acknowledged the existence of a sexual relationship with her. Obviously, plaintiff was aware of a relationship, but until April 1 of 1997, did not know the name of her rival. The Court listened to the testimony of both parties and observed their demeanor, both on direct examination and cross-examination. Much of the testimony of the parties is of a "he said, she said" variety and there was little corroboration. It is irrefutable that for sometime prior to plaintiff's commencement of the action, that he had an ongoing liaison with Jia Gang and fathered a son with her. It is clear that the defendant, through his meretricious relationship with Ms. Gang, is responsible for the breakdown of this marriage.
The Court also finds that the plaintiff made some substantial contribution to the marriage. In addition to working on a full-time basis for the first seven years of the marriage, plaintiff served as corporate wife and mother. When the demands of both roles became difficult to cope with, the plaintiff put her family first and went to work on a part-time basis. This afforded her the ability to meet the needs of the defendant, as well as Matthew. Her non-monetary contributions, such as participation at business functions and assisting the defendant in progressing up the corporate ladder, must be weighed and given some consideration.
The Court has considered all applicable statutory case law CT Page 6797 and all the statutory criteria enumerated in § 46b-82 and § 46b-81c of the Connecticut General Statutes as well as case law submitted in making its determination. It has given the requisite weight to all of the criterial enumerated.
The plaintiff is requesting half of Mr. Hotard's assets. Such a distribution would clearly not be equitable or warranted in the present case. An equal division of assets might be appropriate in a case where the duration of the marriage was lengthy and most of the criteria tilted strongly in favor of the aggrieved. Older women who have been in a long term marriage and out of the business world for many years will find it difficult to be self-supporting. Older divorced women are less likely to remarry than younger women. Courts have recognized that significant alimony is generally more appropriate after a long marriage than after a short one. Bridgeman v. Bridgeman, 391 S.E.2d 367 (1990). Courts considering divorce cases involving long term marriages are most concerned with the continuing financial security of both parties.Freed v. Walker, Family Law in the Fifty States: An Overview, 23 Fam. LQ 49S (1990). Wendt v. Wendt, Superior Court, judicial district of Stamford, Docket No. 149562 (December 6, 1996,Tierney, J.) (21 Conn. L. Rptr. 97), differs substantially from the present case because it was a first marriage for both parties and, unlike the present case, was of thirty-two years duration.Wendt is cited for purposes of "contributions to the marriage." The parties in Wendt grew up together in a small Wisconsin town and formed a union at an early age that transcended Mr. Wendt's professional career. They went to the same high school, were in the same school activities, and they were active in the same church. After their marriage, there was virtually no money. They did the shopping and cooking together, and Mrs. Wendt typed his papers on weekends. She later became a civic leader and devoted herself to helping others. They traveled about the country going from one plant to the next and established a strong mutual bond as he went up the corporate ladder leading to their prodigious financial success. She did much more than the normal "entertaining corporate wife." Plaintiff's activities on behalf of her husband in the present case pale by comparison. When plaintiff married Mr. Hotard, he was well on his way to corporate success. The Court finds that within the limited period of their ten year marriage, the plaintiff made contributions to their marriage. She worked full-time for seven years and handled the difficult role of being a mother and a corporate wife in a responsible manner. She attended functions with Mr. Hotard and handled her own position dutifully. During the short duration of CT Page 6798 the marriage, she had a son but forfeited little. The Court considers the duration of the marriage a significant factor. The plaintiff did not give up or forestall her education to marry the defendant nor did she abandon her career. She is only forty-seven, has good health and is sophisticated. She still has her excellent career in front of her.
 ORDERS
1. CUSTODY AND VISITATION
The parties shall have joint custody of the minor child, Matthew Hotard. The child shall reside with the plaintiff, and the plaintiff shall have primary physical custody. The defendant shall have reasonable, flexible visitation. The defendant shall make all reasonable attempts to provide the plaintiff with a schedule for his proposed visitation no less than thirty days in advance.
The parties shall consult with each other concerning major events affecting the child's life. The defendant shall be kept fully informed with regard to all major events and shall be entitled to all reports from third parties concerning health, education and welfare of the child. He shall be entitled to parent tickets for any school or sporting events.
2. ALIMONY AND CHILD SUPPORT
The husband shall pay to the wife, as unallocated alimony and support, the sum of $10,000 per month for a period of five years from the date of dissolution. At the end of the five year period, defendant shall pay to plaintiff for child support the sum of $4000 per month. Child support shall continue through graduation from high school, but not beyond the age of nineteen years. In addition, the defendant shall be responsible to pay the cost of any private education for Matthew through and including high school graduation including, but not limited to, room, board, tuition, books, tutors, and travel to and from school. In the event that Matthew attends public school, the defendant shall pay the cost of any required tutoring.
3. HEALTH INSURANCE
The defendant shall maintain health insurance for the minor child. The defendant shall pay all costs of unreimbursed medical CT Page 6799 and dental expenses incurred by the child. The plaintiff shall not contract for extraordinary expenses without first consulting with the defendant, except in the case of emergencies. The parties shall agree on any psychological or psychiatric therapy for the child. The parties further agree that they will utilize the services of the approved providers concerning said health insurance and will give to the health insurance carrier any prior notice as required to obtain coverage.
If plaintiff elects pursuant to COBRA to be maintained on defendant's existing health insurance policy, then defendant shall fully cooperate with applications, etc. Any increase in premium shall be borne by the plaintiff.
4. LIFE INSURANCE
The defendant shall continue to maintain his life insurance trust on behalf of his son Matthew as beneficiary. Matthew shall continue to be a designated beneficiary at least until Matthew attains the age of twenty-one.
5. COLLEGE EDUCATION
The parties have established custodial accounts for Matthew's college education consisting presently of at least $72,000. The parties shall maintain same for this purpose. To the extent that the funds are insufficient to meet Matthew's college expenses, the defendant shall be responsible for the expenses of a four year college education for the child. Said obligation shall continue until the child attains the age of twenty-three years, but not beyond.
There shall be consultation between the parties concerning the choice of educational institution, keeping in mind the needs of the child and the appropriateness of the school.
6. PROPERTY DISTRIBUTION
The defendant shall immediately quitclaim all of his right, title and interest in the marital home at 24 Norrans Ridge, Ridgefield, Connecticut, having an agreed upon value of $1,075,000, to the plaintiff. Plaintiff shall keep all the contents of the marital home. The defendant shall retain his interest in the real property at Lot #12, Two Rivers Point, Williamsburg, Virginia, and #401 Worker Stadium Street, Beijing, CT Page 6800 China, free and clear from any claim by the plaintiff.
7. The parties shall divide the proceeds of the following joint accounts; 50 percent to the plaintiff and 50 percent to the defendant as of the date of this judgment: PRU Custom Command account #OUC-174504 with a balance as of December 31, 1998 of $624,324; and PRU Securities account #MAC 011733-07 with a balance as of December 31, 1998 of $201,327. The plaintiff shall retain her two joint Fleet accounts #592-5-304 and #1760091455 with a combined balance of $3891. Defendant shall retain his Aquarion and Dexter Mellon Securities, and USAA Tax Exempt Mutual Fund accounts totaling approximately $2700.
8. The defendant shall retain his individual USAA account #029-5791-4 with a balance of approximately $189,000; his PRU Securities account #OUC 1241132-15, with a balance of approximately $70,000; and his two USAA Bond accounts #44900133709 and #43900317835, with a combined balance of $28,400.
9. Each party shall retain their respective individual Prudential IRA accounts in the approximate amount of $45,000.
10. Defendant shall retain all of the shares of Praxair stock in his dividend reinvestment account (Bank of New York #0000602425), having a value of $3,161,555 as of February 4, 1999. Plaintiff shall retain any and all interest in her PRU Securities account #OUC 635714-15, having a value of $48,550 as of February 4, 1999.
11. Defendant shall retain all of his benefits in any of his qualified retirement plans. He shall also retain all of the value (whether lump sum or annuity) in any of his non-qualified plans. Plaintiff shall retain any and all interest she may have in her Union Carbide pension accounts.
12. Defendant shall retain all of his interest in his deferred income plans at Praxair, Union Carbide, Dexter Mellon and Aquarion. Plaintiff shall retain any and all interest she may have in her deferred income plans.
13. Defendant is the owner of 10,000 Union Carbide and 267,000 Praxair vested stock options, having a value of $5,518,550, as of February 4, 1999. Defendant shall retain all of his interest in same. As of same date, plaintiff owns 8,000 Union CT Page 6801 Carbide and 4,000 Praxair vested stock options having a value of $217,420. Plaintiff shall retain her interest in said options.
14. Defendant has 110,000 non-vested Praxair stock options granted him in recognition of past performance. He shall retain his entire interest in same. Defendant also has performance shares of Praxair stock (Launch Plan II), which are restricted and will be distributed at a later date. Their total value as of February 4, 1999 is $1,358,879. The defendant's performance shares were granted to him in recognition of past services. Defendant shall retain his entire interest in said asset.
15. The defendant is a signatory to a consulting and separation agreement, dated January 4, 1999, which details the terms of his severance and consulting arrangement with Praxair. Payments under said agreement are shown as assets on the defendant's financial affidavit. He shall retain his entire interest in his severance payments and payments for unused vacation days due under the terms of the consulting and separation agreement, including the Praxair Incentive Compensation Award payment for 1998 performance. Defendant's pretax value in this asset is $3,309,308.
16. The defendant shall assign a portion of his assets, property, and estate payable to plaintiff in the amount of $3,600,000, cash or certified funds. Said sum shall not be taken as a tax deduction by the defendant nor treated as taxable income to the plaintiff.
 MISCELLANEOUS
17. Plaintiff shall retain her Mid Ocean Club membership in Bermuda at her own expense.
18. The defendant shall transfer to the plaintiff the certificate of membership in the Silver Spring Country Club having a valuation of $35,000. Each party shall cooperate in implementing any membership delineations.
19. The defendant shall make plaintiff and their minor child irrevocable beneficiaries of his Praxair Connecticut General Executive Life and Flexible Premium Adjustable Life Insurance Policy # CUL001875Z for so long as he has a support obligation. His obligations to maintain same shall be reduced proportionally as his obligation decreases. Defendant shall not be allowed to CT Page 6802 take any loans against the cash value needed to protect his support obligations to the beneficiaries. The defendant shall retain all other insurance policies in his name and the cash values thereof including but not limited to USAA Whole Life Policy # 0581489701 and USAA Level Term Policy #P238755899.
20. Defendant shall return plaintiff's sapphire jewelry and presentation watch to her upon the dissolution of the marriage.
21. The claim for pendente lite alimony in the amount of $201,000 and reimbursement for medical/dental reimbursements has heretofore been resolved by prior order of the Court.
22. Defendant shall transfer to the plaintiff the title of the 1994 Jeep Grand Cherokee. He shall retain his 1998 Toyota 4 Runner and 1995 Mazda Millennia. Plaintiff shall retain the 1986 Acura.
23. Each party shall be responsible for their own liabilities as shown on their respective financial affidavits.
24. The parties shall each be responsible for the payment of their own legal and expert witness fees.
Owens, J.